IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | 2:05cr381 |
| ROGER NOEL WILLIAMS, ) | Judge Thomas M. Hardiman |
| CHAD MILLIRON, ) | |
| ) | |
| Defendants. ) | |

## OPINION

On December 13, 2005, a grand jury indicted Defendants Roger Noel Williams, Chad Milliron, and Jeremy Tillman each on one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of crack cocaine, in violation of 21 U.S.C. §846. On March 20, 2006, Defendant Williams filed two motions to suppress evidence seized in connection with the charge, challenging searches conducted on November 15, 1999 and March 14, 2005, respectively. Defendant Milliron joined both motions. The Court held an evidentiary hearing on May 11, 2006. For the reasons that follow, the motions will be denied.

I.  **Findings of Fact**

A.  **The 1999 Search**

On November 10, 1999, Pennsylvania State Trooper Jeffrey Brautigam performed a search at the residence of Dennis Willochell and found illegal narcotics, drug paraphernalia, and a firearm. The firearm's serial number was traced to John Caiaccia as the licensed owner and turned out to be one of thirty-three firearms stolen from Caiaccia's residence. An interview with

Willochell on November 12, 1999 revealed that Gino Conti had sold the firearm to Willochell. In the early morning hours of November 13, 1999, Trooper Brautigam and two other officers interviewed Conti following his arrest just hours earlier and Conti admitted burglarizing the home of Caiaccia in early October 1999. Conti admitted breaking into a foot locker and removing all the firearms therein, placing all of them inside a black gym bag, except for an AK-47 that he placed inside a black Nike baseball bat bag. Conti stated that he traded all the firearms to Willochell in exchange for ten pounds of marijuana. He further stated that Willochell subsequently traded a Tec 9 firearm and the AK-47 to "Toy" Jackson in exchange for three and one-half grams of crack cocaine.

At approximately 11:00 a.m. on November 13, 1999, Brautigam and another officer interviewed Delani Willochell, Dennis Willochell's wife, who stated that in approximately late October 1999, Gino Conti visited her residence while possessing three firearms and that Conti traded them to her husband Dennis in exchange for marijuana. She stated that a few days later, Mr. Willochell contacted Toy Jackson and informed her that he "had what she was waiting for." She stated that approximately forty minutes later, Jackson arrived at her residence, followed by Conti. Delani Willochell stated that Dennis Willochell and Conti traded one gun that appeared to be automatic to Jackson in exchange for an amount of crack cocaine. She stated that the AK-47 remained at her residence for a few days longer until Conti returned to her house and removed it.

In the early afternoon of November 13, 1999, the same two officers re-interviewed Conti, who changed his story by stating that he did not give "all" the firearms to Willochell, but that he kept some handguns, one of which he later sold to Kenneth Smith for $150.00 and four of which he sold to Roger Williams for $500.00. Conti stated that thereafter, Roger Moore bought two of

the firearms from Williams, and David Headon bought at least one of the firearms from Williams. Based on the foregoing facts, Brautigam submitted an affidavit to Westmoreland County Judge Blahovec, who issued a search warrant for Williams' residence, as well as separate search warrants for Moore's and Headon's residences. Brautigam did not tell Judge Blahovec that the sale to Williams actually took place at Williams' residence, nor was there any indication of that fact in the affidavit. The warrant to search Williams' residence listed forty-two items to be seized, including thirty-two firearms, ammunition, jewelry, and documents proving residency. Notably, the list did not include any drugs or drug-related paraphernalia.

A few days prior to executing the warrant, though it is unclear from the record exactly when, undercover troopers made controlled purchases of drugs from Williams' residence.[1] On November 15, 1999, Brautigam and other officers executed the search warrant at Williams' rented home. During the course of their search, they discovered marijuana in a third-floor bedroom where Defendant Milliron resided. While searching an unlocked downstairs safe opened by Williams, the officers found a "big duct taped thing of currency." Hearing Tr. at 26. After discovering these items, the officers approached Williams, presented him with a "waiver of rights and consent to search" form, which Williams signed. The following exchange at the hearing reveals how these events transpired:

> THE COURT: All right. Now, then, what did you do with the cash? Did you leave the residence?
> THE WITNESS [Brautigam]: No. No. No. We stayed there, talked to Mr. Williams, who was in the kitchen area. At the same time we also found the marijuana, went down and talked to Mr. Williams, explained to him the items we found, asked him we either have to apply for another

---

[1] This fact was not in the affidavit, but was elicited from Brautigam under oath at the hearing. See Hearing Tr. at 26.

> search warrant or he can give me written consent. I sat down with him with the consent form, read it to him verbatim. He signed it, put his address down. I had two witnesses do that. We went back and seized the money, took the marijuana. We actually had the drug dog come at the house, run the drug dog over the money, which the dog hit, and we went ahead and seized the money and everything else listed on that property record or inventory list. Then we left the residence.

*Id.* at 48-49. Ultimately, the officers seized some papers, gold coins, marijuana, the $10,000 in cash found in the safe, and an additional $5,983 in cash from Williams' wallet. They did not find any of the items listed in the warrant, however. Later, the troopers, acting under the direction of the Pennsylvania Attorney General's office, returned all of the money seized that day to Williams.

### B.     The 2005 Search

On March 13, 2005, Trooper Brautigam interviewed Jeremiah Beneman, who told him that he had been selling cocaine for Defendant Williams in the 2001 time frame. Beneman said that "Williams would wrap his money in $15,000.00 increments and would wrap it in duct tape." In the summer of 2001, Brautigam investigated Ronald Robinson and discovered that he had been selling crack cocaine and powder cocaine for Williams' organization, "which conducted their drug business out of Roger Williams' residence of 2-A Penn Manor Road." Brautigam interviewed Robinson on January 18, 2002, when Robinson disclosed additional information about drug activities involving Williams, partly corroborated by Williams' own son.

On April 13, 2002, Brautigam received information from Jalaspian Charles in prison, who "admitted that he has been Roger Williams' supplier of cocaine for about six to eight months."

In November 2004, Brautigam arrested Austin Williams, Williams' brother, for

possession of crack cocaine. Austin said that his brother "is still selling drugs but that Roger Williams has Chad Milliron holding all of the drugs at his residence."

On March 7, 2005, Trooper Dschuhan conducted a traffic stop of a vehicle driven by Milliron "and the passenger being Roger Williams." During this stop Milliron was arrested after a chase, and a search incident to the arrest revealed over $500 that alerted positive for narcotics following a dog sniff. During that week, two different sources also told Brautigam that "the reason Chad Milliron took off running was because he had cocaine in his pockets." Two days after the traffic stop of Milliron, on March 9, 2005, Trooper Andrekanic contacted Trooper Brautigam to let him know that he had arrested Clair Fisher the day before for a number of burglaries. Fisher said that he sold Williams at least twenty-one firearms from December 2004 through March 2, 2005. Fisher also said that he sold percocets to Williams. Fisher "said that he [Fisher] was a drug addict and would purchase cocaine from Chad Milliron, [who] would have to go through Williams in order to buy the cocaine."

On March 14, 2005, Trooper Lander was conducting surveillance on Milliron and followed him from his residence to Williams' residence. Hours later, Trooper Brautigam applied for a search warrant on Williams' residence, and his nineteen-page, single-spaced affidavit contained all of the foregoing information and a great deal more. Accordingly, Judge Blahovec issued the warrant. This time the warrant listed twenty-one firearms, drugs, books, records, financial proceeds including currency, photographs, and two Dell laptop computers. Later that afternoon, Brautigam and other law enforcement officers executed the search warrant at Williams' rented home. During the course of this search, the officers seized a pistol, ammunition, papers, two cell phones, prescription drug vials, a "plastic bag with suspected

5

marijuana," and $7,739 in cash wrapped in duct tape.

## II. Analysis

### A. The 1999 Search

Williams challenges the 1999 search on four grounds: (1) the unreliability of the information contained in the supporting affidavit; (2) the insufficient nexus between the alleged criminal activity and Williams' residence; (3) the warrant's overbroad list of items to be searched and seized; and (4) the lack of consent with respect to the items ultimately seized that were not contained in the warrant. The Court addresses each argument in turn.

#### 1. Reliability of the Information

Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause may be based upon information from a reliable informant. *Draper v. United States*, 358 U.S. 307, 313 (1959). An informant's reliability may be shown by independent investigation or corroboration. *Illinois v. Gates*, 462 U.S. 213, 241-42 (1983). Hearsay alone may also be sufficiently reliable to establish probable cause based on the totality of the circumstances. *See Massachusetts v. Upton*, 466 U.S. 727, 732, 734 (1984) (per curiam). Helpful to a magistrate in conducting this inquiry are "circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information . . . ." *United States v. Ritter*, 416 F.3d 256, 262 (3d Cir. 2005) (quoting *Gates*, 462 U.S. at 238-39). In conducting that analysis:

6

> [A] magistrate judge must "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." [*Gates*, 462 U.S. at 238]. In reviewing such a determination, our role is quite limited. We must simply decide whether the magistrate judge had a substantial basis for concluding that probable cause existed. [*United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993)]. Therefore, "a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found." *Id.* (footnote omitted).

*United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997); *see also Ritter*, 416 U.S. at 264 ("The Supreme Court has clearly indicated that the conclusions of a neutral magistrate regarding probable cause are entitled to a great deal of deference by a reviewing court, and the temptation to second-guess those conclusions should be avoided.").

In this case, based on the totality of the circumstances, Judge Blahovec had a substantial basis for concluding that probable cause existed to support the search warrant. A known informant is generally more reliable than an anonymous one because a known informant's reputation can be assessed, and he can be held responsible if his allegations turn out to be fabricated. *Florida v. J.L.*, 529 U.S. 266, 270 (2000). When Conti provided information during the 1999 investigation, Trooper Brautigam knew his identity, as did Judge Blahovec when he signed the warrant. This knowledge removes some of the concerns that have led courts on occasion to hold that a warrant lacked sufficient indicia of probable cause. *See, e.g., United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996).

Conti was also reliable because Brautigam's affidavit contained facts sufficient to support Conti's basis of knowledge. First, Conti, as the seller of the guns, directly observed and conducted his transaction with Williams. *See* 2 Wayne R. LaFave, *Search and Seizure* § 3.3(d)

(4th ed. 2004) ("[T]he surest way to establish a basis of knowledge is by a showing that the informant is passing on what is to him first-hand information."). Thus, the foundation for Conti's knowledge was known. *See, e.g., United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993). Second, Conti described with specificity each of the four types of handguns he sold, as well as the amount of money he earned on the sale. Third, it is undisputed that Conti stole the firearms, corroborated by the fact that the gun models he named during his interviews matched those of the guns stolen. Fourth, Brautigam obtained Conti's information less than a month after Conti allegedly sold the guns to Williams, so the information was not stale. Therefore, Conti plainly relied on more than a casual rumor or even direct observation as merely a third party.

Williams' most viable argument is that Conti was not credible because of the inconsistencies within his statements as recounted in Brautigam's affidavit. Williams suggests that Conti lied during his first interview with Brautigam, so whatever he said during his second interview would be insufficient to establish probable cause to believe that he had sold four guns to Williams. Conti's statement that he sold *all* of the stolen guns to Willochell was inaccurate.[2] The inaccuracy does make the case a closer one, but Conti's "lie" did not involve making up some random person's name; rather, it involved the omission of an additional person. This is significant because there is no danger that Conti was merely pointing fingers, for example, at anyone with whom he had an axe to grind. Indeed, the additional interview with Willochell's wife revealed that Conti's statements were accurate in naming Jackson as an additional recipient of the stolen guns, thus corroborating a significant, previously unknown fact from Conti's first

---

[2] Apparently, Mrs. Willochell's statement that Conti returned to her house to retrieve the AK-47 also conflicts with Conti's statement that Toy Jackson then possessed the AK-47.

8

interview. *See, e.g., Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997) (accuracy on past occasions adds to reliability of informant in totality-of-the-circumstances analysis). The independent corroboration of Conti's information that he participated in the selling of stolen handguns to Jackson bolsters the veracity of Conti's very similar information with respect to Williams. Therefore, when Brautigam re-interviewed Conti, his revelation of Williams' name was more reliable than not, especially given Conti's known identity and basis of knowledge.

Both the Supreme Court and the Court of Appeals consistently have cautioned that in close cases, the reviewing court must pay a great deal of deference to the magistrate judge issuing the warrant. *See, e.g., United States v. Ventresca*, 380 U.S. 102, 108 (1965); *Ritter*, 416 F.3d at 263-64. Thus, the affidavit, containing the information provided by a known informant with a solid informational foundation on this occasion and substantial reliability on a prior occasion, was sufficient to support the magistrate's probable cause determination.

### 2. Nexus Between the Searched-for Items and Williams' Residence

Williams next argues that suppression is required because there is no nexus between the items that were the subject of the warrant and his residence. In support of this proposition, he repeats the rather general principle that "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. The Stanford Daily*, 436 U.S. 547, 556 (1978). This statement is true enough, but Williams fails to show that Judge Blahovec's conclusion was unreasonable in the particular context of this case. The Third Circuit has reiterated:

> While ideally every affidavit would contain direct evidence linking the
> place to be searched to the crime, it is well established that direct evidence
> is not required for the issuance of a search warrant. Instead, probable
> cause can be, and often is, inferred by "considering the type of crime, the
> nature of the items sought, the suspect's opportunity for concealment and
> normal inferences about where a criminal might hide stolen property."

*United States v. Whitner*, 219 F.3d 289, 297 (3d Cir. 2000) (quoting *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir.1985)); *accord United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) ("[D]irect evidence linking the residence to criminal activity is not required to establish probable cause."). In issuing a warrant, a judicial officer "need only conclude that it would be reasonable to seek the sought-after objects in the place designated in the affidavit; a court need not determine that the evidence is in fact on the premises." *Ritter*, 416 F.3d at 263 (citing *Conley*, 4 F.3d at 1205).

In this case, it was reasonable for Judge Blahovec to believe that one or more of the stolen firearms would be located at Williams' residence. *See, e.g., United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (firearms qualify as a type of evidence "likely to be kept in a suspect's residence"); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) (reasonable to believe that gun and silencer were located in suspect's residence); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) ("[P]eople who own pistols generally keep them at home or on their persons."); *United States v. Rahn*, 511 F.2d 290, 293 (10th Cir. 1975) (reasonable to assume that individuals keep weapons in their homes); *Bastida v. Henderson*, 487 F.2d 860, 863 (5th Cir. 1973) (a very likely place to find the pistols would either be on the persons of the assailants or about the premises where they lived). In none of the foregoing cases was there direct evidence that a transaction involving the gun or guns at issue took place within the property searched.

In addition to the substantial legal authorities cited above, the fact that less than one month elapsed between Conti's alleged sale to Williams and the officers' execution of the search warrant supports the reasonableness of concluding that one or more firearms would still be in Williams' residence.[3] Besides the guns, the warrant also listed a ruby ring, diamond ring, and fourteen-karat gold chains among the items to be seized. It was eminently reasonable to believe that Williams would store such valuables in his home. *Cf. Jones*, 994 F.2d at 1056. Absent any indication that Williams had concealed these items elsewhere, it is not only reasonable, but also probable that they would be located in his residence.

### 3.     Overbreadth of the Warrant

In support of his argument that the warrant was "overbroad," Williams relies on an old Supreme Court case that discusses the particularity requirement. *See Marron v. United States*, 275 U.S. 192, 196 (1927). In *Lawmaster v. Ward*, 125 F.3d 1341, 1348 (10th Cir. 1997), however, the Tenth Circuit held that the warrant's description – "[a]ll types of firearms required to be registered with the Bureau of Alcohol, Tobacco and Firearms in the National Firearms Registration and Transfer Record" – was not unconstitutionally overbroad. When compared to the warrant in that case, the instant warrant's meticulous listing of each stolen gun by model and serial number, any one of which might have been in Williams' possession, could hardly be more particular. In any event, despite citing overbreadth principles, Williams never attacks the warrant facially as being overbroad; instead, he raises the very different problem of the execution of a

---

[3] Williams also suggests that Conti's statement that Moore and Headon possessed the handguns means that Williams could not still have had them at the time of the search. This would indeed be a very different case had Conti said that Headon bought two firearms from Williams. The affidavit states, however, that Headon bought *at least one* firearm from Williams. Thus, it is reasonable to infer that Williams still possessed one of the four handguns Conti originally sold to him.

11

warrant beyond its permissible scope, which has nothing to do with the validity of the warrant itself. *See United States v. Loy*, 191 F.3d 360, 369 (3d Cir. 1999) (overbreadth challenge is based on the language of the warrant). As discussed in the next subsection, the officers did not violate the Fourth Amendment in seizing items not listed in the warrant.

Even if the Court were to hold that probable cause was lacking to support the search warrant or that it was overbroad, "suppression of the evidence obtained pursuant to the warrant would not be justified under *United States v. Leon*, 468 U.S. 897 (1984)." *Williams*, 124 F.3d at 421 (parallel citations omitted). The Court need not linger over a *Leon* analysis, however, because where the probable cause analysis strongly favors the government or is close, the defendant cannot prevail. *See, e.g., Ritter*, 416 F.3d at 264 (describing the officer's reliance as "clearly not subject to attack"); *Williams*, 124 F.3d at 421 (describing defendant's argument as "patently wrong").

Williams insists that the officers' reliance on the warrant in this case was not reasonable and so *Leon* could not apply. This argument could succeed under only one of four situations:

> (1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function; (3) when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. $92,422.57*, 307 F.3d 137, 146 (3d Cir. 2002) (citation omitted). Williams concedes that the first two situations are inapplicable to his case. The third situation is also absent here because Trooper Brautigam did not submit a "bare bones" affidavit; it contained

12

specific information garnered from an investigation, such that a state trooper could rely on a judicial officer's conclusion that there was probable cause. Also, the affidavit stated that "it is common for individuals to utilize their residence to store their firearms and ammunition." Again, given the existing judicial support for that view, even assuming error by Judge Blahovec, "the officers could not be expected to know that the magistrate judge made an erroneous probable cause determination" because of insufficient evidence connecting Williams' house to the firearms. *Loy*, 191 F.3d at 368-69. Williams' argument that the fourth situation is present also fails because the warrant listed each gun to be seized by model and serial number, as well as Williams' exact address. Again, it is difficult to imagine how the warrant could have been more particular, let alone so "facially deficient" as to render an officer's reliance thereupon unreasonable.

### 4. Plain View and Consent

Williams next argues that the officers who conducted the search had no right to seize the items they did because they were neither listed in the warrant nor saved by either the consent form or the plain view doctrine. Police officers are permitted to "seize incriminating evidence in plain view during the course of a lawful search . . . ." *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 141 (1990)). The plain view doctrine applies in this case. First, the officers' seizure of the marijuana, an illegal drug, is undoubtedly valid. The Court has already determined that the officers were lawfully in Williams' residence pursuant to the valid search warrant. Furthermore, the officers were permitted to search in the bedroom dresser because there was a reasonable likelihood that it contained one of the firearms or other items listed in the warrant. *See, e.g., California v. Acevedo*, 500 U.S. 565, 574-76

(1991). There is no allegation that the officers engaged in additional investigation in order to "see" the marijuana. *See Menon*, 24 F.3d at 561. Therefore, there is no basis upon which to suppress the marijuana.

A closer question than the seizure of the marijuana is whether the officers' seizure of the money was valid because they had probable cause to believe that it was the proceeds of illegal activity. Like the upstairs bedroom dresser, the unlocked safe could be searched because it reasonably could have contained one or more of the items listed in the warrant. It is also undisputed that the cash bound with duct tape was in plain view from the officers' vantage point looking into the safe.

However, the Court assumes without deciding that the officers could not discern the cash's incriminating nature without any further investigation, so seizure of the money based solely on the plain view doctrine would have constituted an impermissible extension of the scope of the warrant. "A Fourth Amendment 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Brown v. Muhlenberg Township*, 269 F.3d 205, 209 (3d Cir. 2001) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). No one disputes that when the officers removed the cash from the premises, they had effected a seizure. They did not, however, immediately seize the cash in the sense of meaningfully interfering with Williams' possessory interests in it. Here, the officers only moved the cash to a different place inside the same house and even asked for Williams' consent to remove it from his custody.

Unlike a permanent seizure, the temporary investigatory detention of property does not require probable cause, only reasonable suspicion. *United States v. Place*, 462 U.S. 696, 706-07

(1983). Even assuming there was no probable cause to believe that a large wad of cash in the safe was somehow linked to criminal activity, there was at least reasonable suspicion. First, the officers had already found the marijuana upstairs. Second, the officers were aware that Williams' residence had been the site of drug transactions in the past, thanks to the recent controlled buys there. Third, their search warrant included information that Williams had resold some of the stolen guns, so perhaps this was the money earned therefrom. Fourth, even if many law-abiding Americans keep large amounts of cash in their home safes, it typically would not be wrapped in duct tape.

*Place* and its progeny teach that officers may investigate a reasonably suspicious piece of personal property in a manner not yet reaching a full search. The troopers in the instant case did precisely what the officers in *Place* did. At oral argument, Trooper Brautigam testified that "[w]e actually had the drug dog come at the house, run the drug dog over the money, which the dog hit, and we went ahead and seized the money . . . ." Reasonable suspicion suffices to expose Williams' property "to a trained canine[, which] did not constitute a 'search' within the meaning of the Fourth Amendment." *Id.* at 707. The "dog hit" refers to a dog's sniff that alerts positive for an item tainted with some narcotic substance. *See, e.g., id.*; *United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992); *United States v. Cartledge*, 928 F.2d 93, 95 (4th Cir. 1991). Once the "hit" occurred, the officers had probable cause to believe that the money was the fruit of a drug crime. *See Karnes v. Skrutski*, 62 F.3d 485, 498 (3d Cir. 1995); *United States v. Massac*, 867 F.2d 174, 176 (3d Cir. 1989) ("[P]robable cause to arrest did not exist until the trained dog reacted affirmatively to the blue luggage . . . ."). Further, "a police officer may draw inferences based on his own experience in deciding whether probable cause exists." *Ornelas v. United*

*States*, 517 U.S. 690, 700 (1996). Based on the canine "hit," as well as all the facts that previously amounted only to reasonable suspicion, someone who had just handled a narcotic substance very likely handled the cash; it was probable that the cash was the proceeds of unlawful drug trafficking. Finally, it is unclear whether the dog also "hit on" the cash found in Williams' wallet, but assuming it did not, once the first hit occurred, there was probable cause to believe that the extraordinarily large sum of cash in Williams' wallet was also tainted.

Once probable cause existed, the seizure of the cash, like the seizure of the marijuana, was valid. There was no need to obtain consent, nor does consent make probable cause any more "probable." Normally, the Court would address consent as an alternative argument, but it is unnecessary here because the consent form Williams signed was limited in scope, as it extended only to "drugs, contraband, financial records, [and] any other fruits of the crime." It would extend to the cash found only if there was probable cause to believe that the cash was "fruit of a crime." In other words, without probable cause, the consent form would have been useless, and the government did not argue that Williams consented in any way other than via the written form. Therefore, if the Court's probable cause determination with respect to the cash were incorrect, consent would not validate the seizure of cash. Accordingly, an analysis of the consent issue is unnecessary.

### B.     The 2005 Search

Much of the analysis of the validity of the 1999 search validates the 2005 search, as well. Here, Williams' first contention is that there is no nexus between the alleged criminal activity and the place to be searched. The foregoing discussion, *see* section II.A.2, *supra*, resolves this issue in favor of the government. The government's response is even stronger here because the

16

affidavit supporting the 2005 search stated that Fisher appeared at Williams' house on numerous occasions to conduct the firearms transactions. Also, the warrant listed "drugs to include cocaine, crack cocaine, marijuana, percacets [sic], heroin and other drugs listed under Title 35." Like firearms, drugs likely are found at the residence of a suspected drug dealer, where the totality of the circumstances reveals that the dealer's activities are numerous and frequent. *See, e.g., United States v. Hodge*, 246 F.3d 301, 306 (3d Cir. 2001); *Whitner*, 219 F.3d at 297-98. The affidavit is replete with information about Williams' drug dealings with Robinson and Milliron, referring to his operation as an "organization." In support of his motion to suppress, Williams notes that "none of the alleged guns or the percocets was found as a result of the search." The results of a search, however, neither justify nor invalidate the *ex ante* probable cause determination. *See, e.g., Massac*, 867 F.2d at 176 n.2 ("We agree with the district court that the later discovery that the blue luggage did not contain a quantity of drugs does not negate the effect of the positive alert for probable cause purposes.").

Williams' second contention is that the information supplied in the affidavit supporting the 2005 warrant was stale. Regarding staleness, the Court of Appeals has stated:

> Age of the information supporting a warrant application is a factor in determining probable cause. If too old, the information is stale, and probable cause may no longer exist. Age alone, however, does not determine staleness. "The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant." Rather, we must also examine the nature of the crime and the type of evidence.

*United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993) (citations omitted). In this case, the information in the affidavit with respect to the guns was not stale because Clair Fisher stated on March 9, 2005, only days before the search warrant was executed, that he had sold over twenty-

17

one stolen handguns and rifles to Williams and Milliron. It is entirely probable that after five days, Williams and Milliron still would be in possession of those firearms. As for the drugs, Williams' relevant interactions with Beneman and Robinson began in 2001, followed by interactions with Charles continuing through 2002. In November 2004, Austin Williams provided additional information about his brother. A March 7, 2005 vehicle stop involving Chad Milliron, allegedly Williams' "runner," further revealed that Milliron possessed drugs that day. The Milliron information ties back to Williams not only because he was a passenger in the vehicle, but also because on March 14, 2005, just hours before the search warrant was issued, Trooper Lander followed Milliron to Williams' residence. Under the totality of the circumstances, Judge Blahovec had a substantial basis to conclude that Williams' residence contained drugs or the fruits of illegal drug activity at the time he issued the warrant. Finally, even if Williams were correct that no probable cause existed to support the warrant as to drugs, guns, or both, it is clear that under *Leon*, the officers reasonably relied on the warrant.

### III.    Conclusion

For the foregoing reasons, Williams' motions to suppress physical evidence will be denied.

An appropriate Order follows.

_Thos M. Hardiman_
Thomas M. Hardiman
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | )   2:05cr381 |
| ROGER NOEL WILLIAMS, | )   Judge Thomas M. Hardiman |
| CHAD MILLIRON, | ) |
| | ) |
| Defendants. | ) |

## **ORDER**

AND NOW, this 23rd day of October, 2006, upon consideration of Defendant Roger Noel Williams' two Motions to Suppress Physical Evidence (Docs. Nos. 46 & 45), Chad Milliron having joined those motions, to which the United States filed two Responses in Opposition (Docs. Nos. 48, 50, & 59), and a hearing having been held on May 11, 2006, it is hereby

ORDERED that said motions are DENIED for the reasons set forth in the Opinion filed herewith.

BY THE COURT:

_Thos M. Hardiman_
Thomas M. Hardiman
United States District Judge